```
           IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF OHIO
                     EASTERN DIVISION


Elisa Gay Landenberger,       :

        Plaintiff,            :

    v.                        :      Case No. 2:12-cv-0091

Commissioner of Social        :      JUDGE MICHAEL H. WATSON
    Security,                        Magistrate Judge Kemp
                              :
        Defendant.
```

REPORT AND RECOMMENDATION

I.  Introduction

Plaintiff, Elisa Gay Landenberger, filed this action seeking review of a decision of the Commissioner of Social Security denying her application for disability insurance benefits. That application was filed on June 29, 2009, and alleged that plaintiff became disabled on March 14, 2008.

After initial administrative denials of her application, plaintiff was given a vidoeconference hearing before an Administrative Law Judge on June 6, 2011. In a decision dated July 6, 2011, the ALJ denied benefits. That became the Commissioner's final decision on January 3, 2012, when the Appeals Council denied review.

After plaintiff filed this case, the Commissioner filed the administrative record on April 23, 2012. Plaintiff filed her statement of specific errors on June 5, 2012. The Commissioner filed a response on September 6, 2012. No reply brief has been filed, and the case is now ready to decide.

II. Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 43 years old at the time of the administrative hearing and who has a high school education plus one year of college, testified as follows. Her testimony appears

at pages 35-67 of the administrative record.

Plaintiff last worked as a receptionist, a job which required both sitting and standing or walking, and lifting up to 50 pounds. She testified that she was fired because she could no longer do what the job required. She had previously worked as a scheduler for a care center and as a patient recruiter. Both of those jobs were sedentary. Finally, she had been employed as a teacher at the pre-kindergarten and elementary school levels.

She elaborated on the difficulty she had at her last job, stating that she became unable to remember how to work the computer system or to put files in alphabetical order. Her physical health had also deteriorated. At the time of the hearing, she was using a walker due to pain in her hips and knees. At home, she uses a cane. She could not sit for more than fifteen minutes at a time and could stand for about the same duration. She could walk a block using either a cane or walker.

Plaintiff was asked if she could do a job which would allow her to alternate between sitting, standing and walking. She did not believe she could do that for eight hours, or even for four. She cannot lift a gallon of milk and could not stoop or bend to pick a half gallon of milk off the floor. Walking down a flight of steps was painful.

Plaintiff testified that she also suffers from fibromyalgia. It is always painful, but sometimes the pain, even from being touched, is intense. It primarily affected her hips, feet, arms and hands. She testified to having no energy and napping during the day. She was also experiencing problems with short-term memory, had constant headaches, and was both depressed and anxious. At least once a month her depression will cause her to stay in her room for a week, sleeping up to 20 hours per day. If she does not take her medication, she is very irritable and thinks about harming herself or others. Her sleep is interrupted

by pain.  She lives with her parents and 15-year-old son, but is unable to care for her younger child.

   Plaintiff said she did no housework.  She occasionally shopped for groceries with her mother.  Her last hospitalization was in 2010.  Her treating doctor was pleased with her response to medication but did not believe she could hold a job.  She attributed her inability to work to a combination of her physical and mental issues.  Her medications caused severe drowsiness and confusion.

                     III.  <u>The Medical Records</u>

   The medical records in this case are found beginning on page 202 of the administrative record.  The pertinent records - those relating to her two assignments of error, and particularly to her claim that the opinions of her treating sources, Drs. Malas and Spare were not dealt with properly - can be summarized as follows.

   The earliest records relate to her treatment by Dr. Hackshaw, a rheumatologist.  In 2006, he reported her pain as "very fatiguing and limiting" and noted that she showed tenderness in 18 of 18 tender point sites.  He began her on 300 mg. of Neurontin but suspected that the dosage would have to increase.  It did so, and Dr. Hackshaw also prescribed Cymbalta and trazodone, all for treatment of her fibromyalgia.  (Tr. 206-08).  By 2008, she had been switched from Neurontin to Lyrica, which had significantly decreased her pain, and had also had steroid injections for her hip symptoms.  However, she was reporting memory loss and inability to concentrate.  (Tr. 248).  That was at about the same time as she stopped working.  About a month later, Dr. Hackshaw saw her and recommended that she begin an exercise routine.  (Tr. 348).  Dr. Everhart, who had treated plaintiff from July, 2008 to September, 2009, reported on September 16, 2009 that she suffered from alcohol withdrawal,

fibromyalgia, anxiety and depression, that her status both physically and emotionally had deteriorated since July 1, 2009, and that she was significantly limited due to chronic pain, anxiety, depression, and alcohol withdrawal.  (Tr. 370-72).  Dr. Lake, also a rheumatologist, saw her a month later and noted diagnoses of fibromyalgia, bilateral trochanteric bursitis, right subdeltoid bursitis, osteoarthritis, vitamin D deficiency, B12 deficiency, hypothyroidism, and a history of depression and anxiety.  Her fibromyalgia was described as "uncontrolled despite multiple medications."  Due to pain, she was unable to carry through on a recommendation that she begin walking.  Her Lyrica dosage was increased at that time.  (Tr. 423-25).  Apparently, Dr. Lake did not see plaintiff between March of 2010 and September of 2010; when seen on that latter date, she reported two hospitalizations for mental issues, a change in medications, and the fact that she was doing somewhat better.  (Tr. 674-75).

   Dr. Reece, a psychologist, evaluated plaintiff on September 23, 2009 at the request of the Bureau of Disability Determination.  At that time, she was receiving outpatient counseling at Dublin Counseling Center.  She had stopped drinking alcohol only two weeks before the interview.  Plaintiff told Dr. Reece that she had problems at her most recent job due to failing at procedures previously learned.  Her mood was mildly to moderately anxious and dysphoric, with some weeping.  She reported both daily pain and daily sadness, and lacked energy.  Her short-term memory was poor but her concentration was satisfactory.  Dr. Reece diagnosed a depressive disorder and an anxiety disorder and rated her current GAF at 55.  He thought that she was moderately impaired in her ability to relate to others and to withstand normal work pressure.  (Tr. 414-17).  Dr. Collins, a state agency psychologist, reviewed this report and other reports on January 4, 2010, indicating that she was

evaluating plaintiff's residual functional capacity from March 14, 2008 to that date.  Dr. Collins concluded that plaintiff suffered from, among others, an affective disorder, an anxiety disorder, and a personality disorder, and that she had moderate limitations in the areas of maintaining social functioning and maintaining concentration, persistence and pace, and that the same moderate limitations applied to eleven separate areas of functioning, including completing a workday and work week without interruption from psychologically-based symptoms.  Dr. Collins thought that plaintiff would benefit from a work environment that allowed her to work "somewhat independently w/o many changes in routine."  (Tr. 460-76).

   Plaintiff was admitted to Riverside Hospital on May 13, 2010 with severe psychological symptoms of increased depression and suicidality.  At that time, she was functionally incapacitated.  She stayed in the hospital for seven days and was discharged with diagnoses of major depressive disorder, recurrent, anxiety disorder with obsessive-compulsive and post-traumatic stress disorder features, and a history of substance abuse.  By the time of discharge, her GAF was rated at 60.  A number of new medications, including Seroquel, were prescribed, and she was referred to intensive outpatient treatment.  (Tr. 700-02).  She completed that program on June 18, 2010, and on July 6, 2010, she was again seen in the emergency room after reporting plans to kill herself by taking drugs and alcohol.  She stated that her condition had deteriorated after the outpatient counseling ended.  She was admitted to the hospital and treated by Dr. Spare, a psychiatrist, at a variety of group sessions.  Upon discharge ten days later, she was diagnosed with bipolar disorder, which had been treated with medication during her hospital stay.  (Tr. 711-12).  Dr. Spare continued to see plaintiff after her discharge, and his notes indicate that she continued to describe chronic

pain, an inability to function on her own, depression, and an inability to be around others.  Her mood and symptoms fluctuated over this time period as well and she reported side effects from her medication.  She also described problems with sleeplessness and irritability.  (Tr. 777-856).  By March 21, 2011, she was taking Abilify, Wellbutrin, seroquel, trileptal, trazodone, lamotrigine, and Cymbalta.  In May, 2011, Dr. Spare described her as unemployable and thought she had marked or extreme limitations in seven separate areas of functioning.  (Tr. 864).

    Notes from throughout the period from 2009-2011 from the Dublin Counseling Center show that plaintiff's mood was "depressed, overwhelmed" or "sad, angry" for the first several months, but that it had improved by January of 2010.  A month later she was described as positive and engaged, but by March, 2010, she reported increases in pain and stress and was emotional and tearful.  Her mood continued to vary over the next several months, months which included her two hospitalizations.  (Tr. 607-73).  On May 4, 2011, her counselor completed a form indicating that plaintiff had marked or extreme limitations in a number of areas of functioning and, like Dr. Spare, concluded that she was not employable.  (Tr. 857).

    Finally, plaintiff received treatment for her fibromyalgia and other physical disorders from OSU Internal Medicine at Morehouse.  She saw various physicians there from 2009 to 2011.  Dr. Malas, one of those physicians, reported on May 19, 2011 that she had a "complex medical history including sever functionally limiting fibromyalgia and bipolar disease."  His testing showed that she could "move all of her limbs against gravity but has no ability to provide any strength resistance."  He noted that she had been referred for a "complete gait, coordination and strength exam" (the results of which do not appear to be in the record).  Finally, as part of her history (but not in a way that would

appear to his own assessment of the situation), his notes state that plaintiff is unable to work even one hour in a day and cannot lift or carry anything heavier than five pounds. (Tr. 859-63).

### IV. The Vocational Testimony

A vocational expert, Dr. Robinson, also testified at the administrative hearing. His testimony begins at page 67 of the record. He characterized plaintiff's past work as a daycare worker as light and semiskilled and as a receptionist as sedentary and semiskilled, although plaintiff performed both of these jobs at a higher exertional level. The personnel scheduler job was also sedentary and semiskilled, as was her other clerical job.

Dr. Robinson was asked some questions about a hypothetical person who was limited to lifting twenty pounds occasionally and ten pounds frequently. That person could sit for four hours at a time for a total of eight hours per day and could also stand or walk for a total of two hours at a time and for up to six hours total. Additionally, the person could not climb ropes, ladders or scaffolds and could climb ramps or stairs occasionally. Occasional stooping, kneeling, crouching, crawling and balancing could also be performed. From a mental standpoint, the person could perform only simple to moderately complex tasks with no high stress, fast pace, or strict production quotas, and could interact with others in the workplace only occasionally.

According to Dr. Robinson, a person with those restrictions, could not perform any of plaintiff's past work. That person could, however, do other unskilled light jobs such as garment sorter, housekeeper/cleaner, or laundry folder. If that person was limited as described by plaintiff in her testimony, however, or as described by Dr. Spare, no work would be available.

### V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 8 through 17 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that plaintiff met the insured requirements for disability benefits through December 31, 2013.  Next, plaintiff had not engaged in substantial gainful activity from her alleged onset date of March 14, 2008, through the date of the decision.  As far as plaintiff's impairments are concerned, the ALJ found that plaintiff had severe impairments including fibromyalgia, obesity, degenerative disc disease of the lumbar spine, bilateral trochanter bursitis, vitamin deficiency, hypothyroidism, depression, anxiety, borderline personality disorder, bipolar disorder, and a history of drug and alcohol abuse.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that plaintiff had the residual functional capacity to perform a limited range of light work, essentially as described to the vocational expert, along with the mental limitations which were also set out in the hypothetical question posed to him.  Adopting the vocational expert's testimony, the ALJ found that plaintiff could not do any of her past work but could perform unskilled light jobs such as garment sorter, cleaner or laundry folder.  Because these jobs exist in significant numbers in the local and national economies, the ALJ concluded that plaintiff was not entitled to benefits.

### VI. Plaintiff's Statement of Specific Errors

In her statement of specific errors, plaintiff raises two issues.  She argues (1) that the ALJ improperly discounted the opinion of her treating physician, Dr. Spare, and also the

-8-

opinion of Dr. Malas; and (2) that the ALJ did not properly evaluate her credibility.  The Court generally reviews the administrative decision of a Social Security ALJ under this legal standard:

<u>Standard of Review.</u>  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'"  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" <u>Id</u>.  <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  <u>Harris v. Heckler</u>, 756 F.2d 431, 435 (6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" <u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d 383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human Services</u>, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  <u>Kinsella v. Schweiker</u>, 708 F.2d 1058, 1059 (6th Cir. 1983).

The primary issue here is the ALJ's treatment of Dr. Spare's opinion which, if accepted, would support a finding of disability.  The ALJ's entire rationale for rejecting his opinion is as follows: "These limitations [in Exhibit 31F, Dr. Spare's report of May, 2011] are inconsistent with the treatment notes

and activity levels as described above.  Specifically the claimant noted improvements in her depression and anxiety and further noted she was getting out more.  While Dr. Spare's treatment notes are considered, his opinion is given limited weight."  (Tr. 15).  The ALJ then went on to give significant weight to the opinions of Dr. Reece and the state agency reviewers, noting that they were "generally consistent with the record as a whole ...."  Id.  The notes from Dublin Counseling Center were mentioned only once, and only for the proposition that plaintiff's mental condition was "improving" in January, 2010 (Tr. 14).  The opinion of her counselor was not mentioned at all.

It has long been the law in social security disability cases that a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once.  20 C.F.R. §404.1527(d); see also Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981).  However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion.  Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990).  The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living.  Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994).  No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision.

Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

Here, the Commissioner attempts to justify the ALJ's decision to give little weight to Dr. Spare's opinion based on two factors - its alleged inconsistency with his own treatment notes, and the general consistency of the contrary reports of the state agency reviewers with the "record as a whole." Doc. 19, at 10. The Commissioner recognizes that the state agency reviewers did not have the benefit of reviewing records relating to plaintiff's two hospitalizations for psychological issues or any of Dr. Spare's notes, since he did not begin to treat her until those hospitalizations occurred. Generally, a review done by a state agency physician that is not based on the entire record must be viewed with some caution. See, e.g., Blakley v. Comm'r of Social Security, 581 F.3d 399 (6th cir. 2009). However, the Commissioner argues that none of those records would have been significant to the reviewers because the 2010 hospitalizations were both triggered by plaintiff's decision to separate from her husband.

The Court concludes that these rationales are insufficient. First, the hospital records and Dr. Spare's treatment notes were not the only portions of the record not reviewed by the state agency psychologists. They also did not have the benefit of a large volume of the counseling records from Dublin Counseling Center. Those records, the records from Marion General Hospital, and Dr. Spare's records constitute the bulk of the evidence about plaintiff's mental condition. Under these circumstances, the state agency reviewers' opinions simply do not reflect the type of record review which can trump the opinion of a treating source.

Further, in order to have found that these various records - including the Dublin Counseling Center records, to which the ALJ referred only once - were generally consistent with the

reviewers' opinions, and generally inconsistent with Dr. Spare's conclusions - the ALJ must have engaged in a very selective review of the records.  As the Court's summary of these records reveals, they do not show a general pattern of improvement. Rather, fairly read, they show wide swings in plaintiff's mood, affect, and symptoms, as well as her response to medications and the side effects they caused.  The ALJ did not cite any of the evidence showing changes or deterioration in plaintiff's condition, preferring to rely exclusively on records which showed temporary improvements in her outlook and activity level.  This, too, is impermissible.  See, e.g, Schultz v. Comm'r of Social Security, 2012 WL 553565 (E.D. Mich. Jan. 31, 2012), *7 ("'cherry picking' or disregarding favorable statements from a record that as a whole, demonstrate the need for long-term mental health intervention, amounts to a distortion of the record"), adopted and affirmed 2012 WL 553944 (E.D. Mich. 2012).  The same is true for the characterizations of plaintiff's emergency hospitalizations as relating exclusively to the break-up of her marriage.  The records demonstrate that various stressors, including her chronic pain, contributed to these hospitalizations (see, e.g., Tr. 700), and that these factors were not all transient or limited in duration.  For all of these reasons, including the fact that the Dublin Counseling Center's notes and the opinion of plaintiff's counselor (even though she is not considered a treating source for purposes of the "treating physician" rule) do not appear to have been considered at all - in violation of 20 C.F.R. §404.1513(d)(1) - a remand is necessary.

    This decision largely moots plaintiff's other arguments. The Court does note, however, that, as set forth in the summary of the evidence, Dr. Malas' office note does not appear to constitute his actual opinion as to plaintiff's physical limitations, and the ALJ was entitled to give the content of that

note little or no weight.  As to plaintiff's credibility, however, the Court, while agreeing that plaintiff's testimony as to a total level of physical disability, may be inconsistent with the record as a whole, again views the ALJ's decision as reflecting a very selective reading of the record.  For example, as plaintiff notes in her statement of errors, the ALJ cited her notes of chiropractic treatment only when they showed that she was engaged in some level of activity, apparently choosing to ignore the balance of the notes which reflected the contrary.  The same can be said of the review of Dr. Spare's notes and, again, there was no mention of the Dublin Counseling Center notes when plaintiff's credibility was being discussed by the ALJ.  In this determination, too, the ALJ should perform a complete review of the record before coming to a final conclusion as to the credibility of plaintiff's testimony about the nature and extent of her symptoms.

## VII.  Recommended Decision

Based on the above discussion, it is recommended that the plaintiff's statement of errors be sustained to the extent that the case be remanded to the Commissioner of Social Security for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

## VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence

or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation <u>de novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge
